## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

KATHERINE DUCKWORTH,   )
            )
   Plaintiff,     )
            )
 vs.          )   Case No. 4:17-cv-00299-TMP
            )
NANCY A. BERRYHILL,   )
*Deputy Commissioner for*  )
*Operations of the Social Security* )
*Administration*,      )
            )
   Defendant.    )

## MEMORANDUM OPINION

The plaintiff, Katherine Duckworth, seeks review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for a period of disability, Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Duckworth timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the exercise of dispositive jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9).

# I. Introduction

Duckworth was 50 years old on the date of the ALJ's opinion on June 29, 2016. (Tr. at 20, 242). She completed the ninth grade, while attending special education classes. (Tr. at 274). Her past work experience includes employment as a cashier/checker, waitress, housekeeper/cleaner, dishwasher, and short order cook. (Tr. at 81, 274). Duckworth claims that she became disabled on July 3, 2014, due to "bipolar disorder, shortness of breath, [and] heart attack." (Tr. at 273).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If she is, the claimant is not disabled and the evaluation stops. *Id*. If she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id*. The decision depends on the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step

three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, she will be found disabled without further consideration. *Id.* If they do not, a determination of the claimant's residual functional capacity will be made and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity ("RFC") is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.945(a)(1).

The fourth step requires a determination of whether the claimant's impairments prevent her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the Commissioner to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden is on the Commissioner to demonstrate that other jobs exist which the claimant can perform; and, once that burden is met, the claimant must prove her inability to perform those

jobs in order to be found disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Duckworth meets the nondisability requirements for a period of disability and DIB and was insured through September 14, 2014. (Tr. at 25). She further determined that Duckworth has not engaged in substantial gainful activity since the alleged onset date of her disability. (Tr. at 25). According to the ALJ, the plaintiff has the following impairments that are considered "severe" based on the requirements set forth in the regulations: "[m]orbid obesity, asthma/chronic obstructive pulmonary disease, depressive disorder with anxiety, borderline intellectual functioning, and mild degenerative joint disease of the left elbow." (Tr. at 25). However, she found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 27). The ALJ determined that Duckworth has the following residual functional capacity:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to stand/walk six hours in an eight-hour day; sit six hours in an eight-hour day; and lift/carry twenty pounds occasionally and ten pounds frequently. She can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolding and occasionally be exposed to dusts, fumes, odors, gases and poor ventilation. She can understand, remember, and carry out simple instructions; maintain attention and concentration for a two hour time period in order to complete an eight[]-hour workday; adapt to changes in the workforce that are introduced gradually and infrequently; maintain occasional interaction

with co-workers and the general-public; and is expected to miss no greater than one to two days of work per month.

(Tr. at 34).

According to the ALJ, Duckworth is unable to perform any of her past relevant work, she is "approaching advanced age," and she has a "limited education," as those terms are defined by the regulations. (Tr. at 37). She determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (Tr. at 37). The ALJ found that Duckworth has the residual functional capacity to perform light "work that exists in significant numbers in the national economy." (Tr. at 38). Even though additional limitations impede Plaintiff's "residual functional capacity to perform the full range of light work," the ALJ determined that Plaintiff "would be able to perform the requirements of representative occupations such as a[n] inserter... ; hand bander... ; and bakery worker... ." (Tr. at 34). The ALJ concluded her findings by stating that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 3, 2014, through the date of this decision." (Tr. at 38).

## II.    Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions.  *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Mitchell v. Commissioner, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).  The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner.  *Miles*, 84 F.3d at 1400.  "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'"  *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Indeed, even if this court finds that the evidence preponderates against the Commissioner's decision,

the court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III. Discussion

Duckworth argues that the ALJ's decision should be reversed and remanded for six reasons. First, Duckworth asserts that she meets the requirements of Listing 12.05C. Second, the plaintiff contends that the ALJ failed to afford proper weight to the evidence and opinions examining psychologists. Third, the plaintiff maintains that the ALJ improperly assigned more weight to the non-examining physician than to the examining psychologists.[1] Fourth, the plaintiff asserts that that ALJ erroneously concluded that the plaintiff's subjective complaints regarding her symptoms were not entirely credible. Fifth, the plaintiff contends that the ALJ's decision is not based upon substantial evidence because the hypothetical questions presented to the vocational expert ("VE") did not accurately set forth the plaintiff's limitations. Sixth and finally, Duckworth maintains that the ALJ's

---

[1] The court will combine the discussion for the second and third alleged errors.

finding that she retains an RFC to perform light work is not supported by substantial evidence.[2]

*A. Listing 12.05C*

Duckworth argues that she meets Listing 12.05C because she has a full scale IQ of 69 (as scored by Dr. Wilson in April 2014), in addition to depression and anxiety, mental impairments that impose significant limitations on her ability to work. The Commissioner argues that substantial evidence supports the ALJ's determination that the plaintiff failed to establish deficits in adaptive functioning, which are required for a finding of disability under Listing 12.05C.

To "meet" a listing at the third step of the analysis, the claimant must have an impairment that "satisfies all of the criteria of that listing" and meets the durational requirements. 20 C.F.R. §§ 404.1524(c)(3), 416.925(c)(3). Under Listing 12.05C,[3] the ALJ must first determine whether the claimant has "significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence

---

[2]    The court will combine the discussion for the fifth and sixth alleged errors.

[3]    In August of 2013, the SSA amended the Listing and replaced the words "mental retardation" with "intellectual disability," recognizing the pejorative and offensive connotations that had come to be associated with the impairment. However, the change in terminology did not "affect the actual medical definition of the disorder." Change in Terminology: "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg. 46,499, 46,501 (Aug. 1, 2013) (codified in 20 C.F.R. pt. 404, 416).

demonstrates or supports onset of the impairment before age 22."[4]  In *Jones v. Soc. Sec. Admin., Comm'r*, the Eleventh Circuit stated that,

> [a]lthough the Social Security regulations do not define "deficits in adaptive functioning," the Diagnostic and Statistical Manual of Mental Disorders states that adaptive functioning refers "to how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical."

695 F. App'x 507, 509 n.3 (11th Cir. 2017) (quoting Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 37 (5th ed. 2013)). In other words, "adaptive functioning 'refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting.'"  *O'Neal v. Comm'r of Soc. Sec.*, 614 F. App'x 456, 459 (11th Cir. 2015) (quoting Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed., Text Revision, 2000)).

---

[4]     It has been noted that "absent evidence of sudden trauma that can cause retardation" an IQ test demonstrating retardation creates "a rebuttable presumption of a fairly constant IQ throughout [] life." *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages....  Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir.1989) (holding that absence of IQ test in developmental years did not preclude finding of mental retardation predating age 22 and that courts should assume an IQ remained constant absent evidence indicating change in intellectual functioning).

After satisfying the first three requirements, Listing 12.05C further provides that "[t]he required level of severity for this disorder is met when the evidence demonstrates . . . [a] valid verbal, performance or full scale IQ of 60 through 70 and a physical or other impairment imposing an additional and significant work-related limitation of function."[5] A claimant is conclusively presumed to be disabled if she meets or equals the level of severity of the listed impairment.

---

[5] Listing 12.05 was substantially re-written by the Social Security Administration, effective January 17, 2017. *See* 81 FR 66178, at 66167. The Commissioner agrees, however, that the 2017 version does not apply to the decision made with respect to the claimant's disability. That decision was made under pre-existing Listings. In effect at the time of the ALJ's decision was the following version of Listing 12.05:

> *12.05 Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.* the evidence demonstrates or supports onset of impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (.e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> OR
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> OR
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function;
> OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each for extended duration.

*Perkins v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 870, 872 (11th Cir. 2014)

(quoting *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).  However,

"[a] valid IQ score does not have to be conclusive of [an intellectual disability]

where the IQ score is inconsistent with other record evidence regarding the

claimant's daily living activities and behavior."  *Perkins*, 553 F. App'x at 873.

Additionally, the Eleventh Circuit has held that Listing 12.05C generally is met

"when . . . evidence of an additional mental or physical impairment that has more

than 'minimal effect' on the claimant's ability to perform basic work activities."

*Monroe v. Comm'r of Soc. Sec.*, 504 F. App'x 808, 810 (11th Cir. 2013) (quoting

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)).

The Eleventh Circuit has described the step-three analysis required by

Listing 12.05 as follows:

> To meet listing 12.05 ("intellectual disability"), "a claimant must at
> least (1) have significantly subaverage general intellectual
> functioning; (2) have deficits in adaptive behavior; and (3) have
> manifested deficits in adaptive behavior before age 22." *Crayton*, 120
> F.3d at 1219.  These requirements are referred to as the listing's
> "diagnostic criteria."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00
> ("Listing 12.05 contains an introductory paragraph with the diagnostic
> description for [intellectual disability].")  In addition to satisfying the
> diagnostic criteria, a claimant must meet one of the four severity
> requirements in paragraphs A through D of the listing.  *See id.*
> § 12.05.  Under paragraph C, the only paragraph at issue here, a
> claimant must show that she has both "[a] valid verbal, performance,
> or full scale IQ of 60 through 70 and a physical or other mental
> impairment imposing an additional and significant work-related
> limitation of function."

A valid IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001). At the same time, it is well established that such a presumption does not arise where a qualifying IQ score is inconsistent with other record evidence concerning her daily activities and behavior. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)). But once the ALJ accepts an IQ score as valid and finds that the claimant's impairments meet or medically equal the other criteria of listing 12.05C, the disability determination cannot be based on the claimant's age, education, or work experience. *Id.*

In sum, a claimant proves that she meets listing 12.05C by establishing the diagnostic criteria for intellectual disability, *including deficits in adaptive functioning*; showing onset before age 22; producing a valid, qualifying IQ score; and exhibiting the requisite deficits in work-related functioning.

*Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910-11 (11th Cir. 2015) (italics added for emphasis).

While the ALJ is permitted to consider evidence that is inconsistent with a finding of intellectual disability, an ability to perform work for several years does not rebut the intellectual disability where "there is no evidence that [the job held is] beyond the reach of a mildly retarded individual." *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1380 (N.D. Ga. 1998). Moreover, a finding that a claimant worked in the past, and even that a claimant could return to her past work, does not preclude an award of benefits where the claimant meets or equals a Listing. *Durham*, 34 F. Supp. 2d at 1381.

The ALJ determined that Duckworth did not have deficits in adaptive functioning, thereby avoiding the need to analyze the validity of the full scale IQ score. Specifically, the ALJ held:

> The claimant has at most borderline intellectual functioning instead of an intellectual disability. Dr. Wilson's testing provided low test scores concerning the claimant's IQ. However, as explained above, the claimant would only have an intellectual disability if the claimant had significant subaverage general intellectual functioning and have deficits in adaptive functioning. The claimant took and passed her driving test, which required knowledge of traffic laws and codes. The claimant worked in semi-skilled jobs. A review of the claimant's work history documents that the claimant was previously able to engage in work activity at the semiskilled level, as reported by the vocational expert. Working at a semi-skilled level appears inconsistent with Dr. Wilson's extreme limitations. Furthermore, the claimant has been able to run a household (Exhibits D7E and D5E). The claimant stated that she assists her husband in getting ready for work, she is able to do daily activities such as cleaning, doing laundry, taking care of animals, shopping in stores and cooking. The claimant also indicated that she takes care of her twenty-two year old stepdaughter, whom the claimant describes as slow. The claimant is also able to pay bills and maintain a checkbook and/or procure money orders. The claimant's intellect is described as "average" in the Quality of Life medical notes (Exhibit D7F).
>
> . . .
>
> The claimant was in special education classes during her school years. Nonetheless, the claimant stated that she has taken care of her husband for of over 17 years. The claimant gets up with her husband and assists him, as he gets ready for work. Additionally, the claimant noted that she takes care of her 22-year-old stepdaughter who is "slow". Nevertheless, the claimant's prepares good meals each day and does house cleaning. Additionally, the claimant can shop for food. The claimant and her husband indicated that the claimant could

pay bills and use a checkbook/money order. The claimant and her husband related that the claimant could drive and go out alone. The claimant was able to obtain a driver's license and has worked several jobs including a cashier/checker and short order cook that were semi-skilled jobs, as classified by the vocational expert. Therefore, I find that the claimant does not meet the introductory paragraph in Listing 12.00, which is a prerequisite to meeting the other section 12.05 requirements. Therefore, the claimant does not meet section 12.05 listing.

(Tr. at 31, 34).

In this case, substantial evidence supports the ALJ's determination that Duckworth did not establish deficits in adaptive functioning. Because the ALJ may rely upon the plaintiff's work experience and daily activities and behavior to analyze any deficits in adaptive functioning, as she did here, record evidence supports each of the ALJ's findings regarding Duckworth's adaptive functioning. *Perkins*, 553 F. App'x at 873. As the ALJ pointed out, the plaintiff's abilities to assist her husband and to take care of her stepdaughter, in addition to driving, shopping, maintaining finances, and working semi-skilled jobs, indicate that the plaintiff was not socially dependent on others entirely. Any true deficits in adaptive functioning were minimal at best. Although Duckworth puts forward evidence which contradicts the ALJ's determination, namely her husband's testimony regarding the conflicts that Duckworth has when she encounters people in public, the court may not reweigh the evidence even if the evidence in the record

supports inconsistent results. *Miles*, 84 F.3d at 1400; *Parker*, 793 F.2d at 1181 (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Furthermore, the plaintiff points to the mental health source statements ("MHSS") submitted by Dr. Wilson and Ms. Phillips, LCSW, who both concluded that Duckworth "[c]annot maintain socially appropriate behavior/adhere to basic standards of neatness/cleanliness." (Tr. at 396-97). As will be explained in more detail below, the ALJ afforded little weight to each MHSS. For example, Ms. Phillips's treatment notes indicated that Duckworth's appearance was appropriate, which contradicts her and Dr. Wilson's opinions about Duckworth's neatness and cleanliness. (Tr. at 530, 532, 538, 540, 557, 564, 573, 576). Accordingly, because there is substantial evidence to support the ALJ's determination that Duckworth did not have deficits in adaptive functioning, there is no error in finding that her mental functioning did not meet Listing 12.05C.

B. *Examining and Non-Examining Sources*

Duckworth argues that the ALJ failed to afford proper weight to her examining psychologists, Dr. Wilson and Dr. Nichols, and to her treating therapist, Licensed Clinical Social Worker Kristy Phillips, with regard to Duckworth's ability to interact with the public and co-workers. She asserts that the ALJ substituted her own judgment for that of a medical expert. Furthermore, Duckworth argues that the ALJ impermissibly afforded more weight to a non-

examining physician, Dr. Williams, than to her examining psychologists and treating therapist. The Commissioner argues that substantial evidence supports the ALJ's weighing of the opinion evidence.

Under prevailing law, the ALJ must consider several factors in determining the weight to be given to a medical opinion. The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Different types of medical sources are entitled to differing weights. 20 C.F.R. § 404.1527(c). The opinion of a treating physician, who has an ongoing relationship with the patient, is entitled to the greatest weight. 20 C.F.R. § 404.1527(c)(2). A non-treating physician or psychologist, who has examined the patient but does not treat the patient, is entitled to less weight. 20 C.F.R. § 404.1527(c)(1)-(2). The least weight is given to a non-examining physician, who may provide an opinion based on a review of the medical the record but who has not examined the patient. 20 C.F.R. § 404.1527(c)(1). Any medical source's opinion may be rejected where the evidence supports a contrary conclusion. *See, e.g.*, *McCloud v. Barnhart*, 166 F. App'x 410, 418-19 (11th Cir. 2008).

A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). "Good cause" exists for an ALJ not to give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

Additionally, an ALJ may consider evidence from "other sources," such as licensed clinical social workers, "to show the severity of [the claimant's] impairments and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d) (2016); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).[6] An ALJ may consider the factors listed in 20 C.F.R.

---

[6]      20 C.F.R. § 404.1513 was substantially re-written by the Social Security Administration, effective March 27, 2017. *See* 20 C.F.R.§ 404.1513 (2018). Furthermore, the Social Security Administration rescinded SSR 06-03p, effective March 27, 2017. The Commissioner agrees, however, that the new version of the regulation does not apply and that SSR 06-03p still applies to the decision made with respect to the claimant's disability. That decision by the ALJ was

made under the pre-existing regulation and SSR. At the time of the ALJ's decision, the following version of 20 C.F.R. § 404.1513 was in effect:

### § 404.1513 Medical and other evidence of your impairment(s).

(a) Sources who can provide evidence to establish an impairment. We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). See § 404.1508. Acceptable medical sources are—

(1) Licensed physicians (medical or osteopathic doctors);

(2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrists, for purposes of establishing visual disorders only (except, in the U.S. Virgin Islands, licensed optometrists, for the measurement of visual acuity and visual fields only);

(4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and

(5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence from the American Speech–Language–Hearing Association.

. . .

(d) Other sources. In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to—

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);

(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);

(3) Public and private social welfare agency personnel; and

(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

§ 404.1527 in evaluating the opinions from "other sources." SSR 06-03p, 2006

WL 2329939, at *4-5. Specifically,

> [f]or opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *5.

The Court also must be aware that opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions,… but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

1.  Dr. Wilson and Ms. Phillips's Opinions

The plaintiff contends that Mental Health Source Statements provided by Dr. Wilson and Ms. Phillips indicate that Duckworth cannot interact with the public even on an occasional basis. (Doc. 17 at 24-27). In her decision, the ALJ addressed Dr. Wilson and Ms. Phillips's opinions as follows:

> In the case at hand, Dr. Wilson noted that the claimant drove herself to the evaluation and had a valid driver's license. Dr. Wilson noted that the claimant's affect was irritable and she replied being "sad most of the time". Dr. Wilson related that the claimant reported that she had "three personalities". However, he related that the claimant cleans the house, watches television, and crochets blankets. Dr. Wilson stated that the claimant has a significant reduction in social engagement and reduced energy and activity. However, the claimant denied serious problems with her concentration and memory. Dr. Wilson reported the claimant had serious problems with feelings of worthlessness and there was evidence of anhedonia and restriction of activities. Dr. Wilson opined that the claimant had significant cognitive deficits with extremely deficient verbal skills, and very poor working memory and processing speed. Dr. Wilson opined that the claimant's ability to withstand the pressures of day-to-day occupational functioning was highly impaired and she would have difficulty with the interpersonal and task aspects of any job. Moreover, he reported that the claimant would likely have serious problems getting along with other people on the job. Furthermore, Dr. Wilson submitted a mental health related medical source statement on April 2, 2014, which indicated that the claimant had difficulty maintaining attention and concentration or performing activities within a schedule (Exhibit B3F). He stated that the claimant could not sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; or maintain socially appropriate behavior and adhere to basic standards of neatness and claimant's [sic]. He stated that claimant would miss 30 days of work out of a month due to her psychological symptoms.

. . .

A review of the claimant's actual longitudinal treatment record fails to support the extreme limitations as opined by Dr. Wilson. On April 8, 2014, Kristy Phillips, LCSW, the claimant's mental health social worker, reported that the claimant was oriented to person, place, time, and situation (Exhibit D7F). Ms. Phillips described the claimant's behavior as unremarkable. The claimant's speech and affect were appropriate. The claimant's memory was intact and the claimant's attention was gained and maintained. Ms. Phillips noted that the claimant's thought processes were logical and thought content was unremarkable. In fact, Ms. Phillips rated the claimant's GAF level at 60, which represents only moderate symptomology. For the reasons stated above, I give Ms. Phillips' GAF rating only some weight.

On the other hand, Ms. Phillips also submitted a statement on May 13, 2014, stating that the claimant was unable to understand, remember, or carry out even very short and simple instructions (Exhibit D4F). She related that the claimant did not maintain attention, concentration, and/or pace for a period of at least two hours. Moreover, she related that the claimant did not maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and that she would be expected to miss greater than 25 days of work per month.

However, Ms. Phillips' actual treatment notes on May 13, 2014, the same day that she provided the statement of the claimant's being so mentally impaired, related that there had been no change in the claimant's mental status (Exhibit B7F). In fact, Ms. Phillips' medical notes stated that the claimant's mood was euthymic and estimated that the claimant's intelligence level was average. The claimant's thought processes were described as logical and the claimant's thought content was described as unremarkable. Furthermore, Ms. Phillips rated the claimant's GAF level at 60, which indicates only moderate limitations, which is inconsistent with Ms. Phillips' opinions of the claimant's inability to perform even simple instructions.

. . .

Therefore, due to the inconsistencies between Ms. Phillips and Dr. Wilson's opinions and the claimant's longitudinal treatment records, I afford their statements little weight.

(Tr. 29-31).

Substantial evidence supports the ALJ's decision to afford little weight to the opinions of Dr. Wilson and Ms. Phillips. Notably, neither Dr. Wilson's nor Ms. Phillips's MHSS indicate any limitation regarding interactions with the public or co-workers, other than a notation that Duckworth cannot maintain socially appropriate behavior. (Tr. at 396-97). Although Ms. Phillip's opinion qualifies as an "other source," the court will examine her opinion as if it were a medical source under 20 C.F.R. § 404.1527. Notably, Ms. Phillips's own records are inconsistent with the MHSS she provided to the ALJ. Ms. Phillips consistently reported, with minor, infrequent deviations, that Duckworth's "appearance is appropriate"; that she was "oriented to person, place, time and situation"; that her behavior was unremarkable; that her affect was appropriate and her mood was euthymic; that her intellect was average; that she was cooperative; that her attention was "gained and maintained"; that her impulse control, judgment, and insight were fair; that her self-perception was realistic; that her thought processes were logical; and that her thought content was unremarkable. (Tr. at 530-31, 532-33, 538-39, 540-41, 557, 564-65, 567, 573-74, 576). Duckworth also reported to Ms. Phillips that Citalopram helped with her depression, that it made her feel better, that it helped

with her mood, and that she was compliant with her medications. (Tr. at 531, 533, 539, 541, 557). While Duckworth reported a frustrated mood to Ms. Phillips in later sessions, the frustration stemmed from her husband's controlling behavior and concerns that her husband was cheating on her, (Tr. at 557, 565, 567, 574, 576), not an underlying psychological condition.

Duckworth's social activities and work history contradict Dr. Wilson's limitations concerning her ability to "sustain an ordinary routine" and "maintain socially acceptable behavior." (Tr. at 396). As the ALJ correctly noted, Duckworth and her husband reported in their respective Function Reports that she interacts with family members daily and that she shops for groceries and other goods on a somewhat regular basis each month. (Tr. at 291-98, 310-17). Furthermore, evidence exists in the record demonstrating that she worked semi-skilled jobs requiring interactions with the public and co-workers for many years, working as a waitress at a restaurant and as a cashier at a local grocery store. (Tr. at 274). She also completed daily household chores and managed finances. (Tr. at 312-14). The ALJ permissibly determined that Duckworth interacts with her family despite reporting difficulties in interacting with family and friends, based on self-reports that she helps her husband get ready each morning and that she takes care of her step-daughter. As stated previously, the mere existence of conflicting evidence (namely, her ability to get along well with others) does not

mean that the ALJ's decision is not supported by substantial evidence. The court may not reweigh the evidence, even if the court determines that it would have weighed the evidence differently. *Miles*, 84 F.3d at 1400. Accordingly, substantial evidence supports the ALJ's decision to afford little weight to Dr. Wilson and Ms. Phillips's opinions.

## 2. Dr. Nichol's Opinion

The plaintiff contends that Dr. Nichols, an examining consultative psychologist, indicated that Duckworth cannot interact with the public even on an occasional basis. (Doc. 17 at 25-27). In her decision, the ALJ addressed Dr. Nichols's opinion as follows:

> After the claimant's current claim for disability benefits was filed, the claimant underwent another consultative psychological evaluation conducted by June Nichols, Psy.D., on September 23, 2014 (Exhibit D9F). Dr. Nichols observed that the claimant presented as a neat and clean individual. The claimant's speech was clear and normal in rate. Moreover, the claimant's mood was within normal limits and congruent with thought processes. The claimant's affect was appropriate but her energy was decreased. Dr. Nichols described that the claimant's stream of consciousness was clear, and the claimant was oriented to person, place, time, and situation. However, the claimant's speed of mental processing was slow and her thought processing was impoverished. Nevertheless, Dr. Nichols indicated that the claimant['s] symptomology was only moderate in nature, as Dr. Nichols rated the claimant's GAF level at 55. However, Dr. Nichols opined that the claimant's ability to relate interpersonally and withstand the pressures of everyday work was compromised; and she had deficits, which would interfere with her ability to remember, understand, and carryout [sic] work-related instructions.

I give only some weight to Dr. Nichols['s] findings based in part to the claimant's inconsistent reports to Dr. Nichols. The claimant told Dr. Nichols in September 2014 that she had problems remembering things and that she does not even try to cook (Exhibit D9F). Dr. Nichols noted that the claimant's recent memory functioning and remote functioning appears to be grossly intact. In the claimant's Function Report, the claimant states that she prepares a good meal everyday taking about two hours to prepare and the claimant's husband's Third Party Function Report states that the claimant cooks simple meals (Exhibits D7E and D5E). What Dr. Nichols believed about the claimant's ability to cook is inconsistent with the claimant's Function Report and the claimant's husband's Third Party Function Report. The claimant reported to Dr. Nichols that the claimant had two strokes on June 27, 2014 (Exhibit D9F); however, the medical records do not support that the claimant had a stroke and the claimant's attorney agreed that the medical records do not indicate that the claimant had a stroke in June 2014 (Exhibit D6F). Dr. Nichols found that the claimant could not manage her own funds (Exhibit D9F). However, the claimant and her husband reported that the claimant could pay bills, count change and manage a checking account/money orders (Exhibits D7E and D5E). Therefore, I am giving Dr. Nichols' opinions only some weight.

(Tr. at 31-32).

Substantial evidence supports the ALJ's decision to afford "only some weight" to the opinion of Dr. Nichols. (Tr. at 32). Evidence in the record supports the inconsistencies highlighted by the ALJ. In addition to the inconsistencies noted by the ALJ, Duckworth reported to Dr. Nichols's that she completed the tenth grade, but her disability report and hearing testimony indicates that she completed only the ninth grade, dropping out of high school before fully completing the tenth grade. (Tr. at 49, 274). Importantly, as the ALJ pointed out, she is not required to

accept Dr. Nichols's report whole-sale if the report is based on the potentially questionable credibility of Duckworth. If the information supporting the report is incorrect, it is unquestionable that the report is not entirely credible. If some of the information supporting the report was incorrect, the ALJ reasonably inferred, based on other evidence in the record available to Dr. Nichols, that the information concerning her ability to interact with others was either exaggerated or incorrect when provided to Dr. Nichols. Therefore, the ALJ properly reduced the weight of Dr. Nichols's opinion that Duckworth's "ability to relate interpersonally and withstand the pressures of everyday work was compromised." (Tr. at 31). Accordingly, substantial evidence supports the ALJ's decision to afford only some weight to the opinion of Dr. Nichols.

### 3. Dr. Williams

The plaintiff asserts that the ALJ erred in assigning more weight to the opinion of Dr. Williams, a non-examining physician, than to the opinions of Dr. Wilson, Dr. Nichols, and Ms. Phillips. (Doc. 17 at 29-31). In his decision, the ALJ addressed Dr. Williams's opinion as follows:

> Samuel Williams, M.D., reviewed the evidence on behalf of the State Agency on October 16, 2014, and opined that the claimant's mental condition resulted in a moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration (Exhibits D4A and D6A).

In terms of the claimant's cognitive abilities, Dr. Williams opined that the claimant was able to understand and remember simple instructions (Exhibits D4Aand D6A). He noted the claimant was able to carry out short and simple instructions, and attend and concentrate for two-hour periods on simple tasks with customary breaks and rest, during the regular workday. He indicated that the claimant may benefit from a flexible schedule and may miss one-to-two days a month to work. He related that the claimant's interaction and contact with the general-public should be casual; and criticism and feedback from supervisors and co-workers in the workplace should be casual, and non-confronting and supportive. Moreover, changes in the workplace should be gradually introduced and the claimant may need assistance in setting realistic goals and making plans. I give these opinions of Dr. Williams good weight as these opinions are based on a review of the record and are consistent with the claimant's medical records as explained in the examples below.

For example, the totality of the evidence establishes that the claimant functions independently in her daily activities, as she provides for her own personal care, cares for pets, and even assists her husband. The claimant is also responsible for the care of her twenty-two year old stepdaughter, whom the claimant describes as being "slow."

Additionally, the evidence indicates that the claimant would have some difficulty maintaining continuous contact with others. Nevertheless, the claimant interacts with family members on a daily basis. Moreover, the claimant's ability to shop reveals that she has the capability of interacting with the general-public on an occasional basis.

In terms of the claimant's cognitive abilities, her ability to perform a variety of household chores, including cooking, establishes that the claimant is capable of performing at least simple tasks with adequate concentration. Furthermore, the claimant is able to maintain the household's finances by being about to take care of the bills and keep up a checkbook or purchase a money order. In addition, the longitudinal treatment records consistently reflect that she was alert and was able to maintain orientation. Therefore, the totality of the evidence establishes that the claimant is capable of performing simple,

unskilled work-related tasks. Furthermore, I determined that the claimant should have only occasional interaction with others to minimize her stress level.

(Tr. at 32-33).

Substantial evidence supports the ALJ's decision to afford "good weight" to the opinion of Dr. Williams, a non-examining physician. (Tr. at 32). Dr. Williams's opinion was consistent with the record as a whole. As noted in the ALJ's decision, Dr. Williams's opinion did not contradict the medical evidence contained in the record or the function reports submitted by Duckworth or her husband. Despite the plaintiff's arguments to the contrary, where the ALJ permissibly affords the proper weight to treating and examining sources' opinions, the ALJ may afford good weight to a non-examining source's opinion even if that opinion is the only opinion left standing. *See, e.g.*, *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 901-03 (11th Cir. 2012) ("the ALJ did not err by relying on the opinions of the non-treating physicians, taken alone, in a way that left its decision unsupported by substantial evidence. The evidence supported a contrary conclusion to Dr. Goss's opinion, and the ALJ was not prohibited from reaching that conclusion simply because non-treating physicians also reached it."); *Jarrett v. Comm'r, Soc. Sec.*, 422 F. App'x 869, 873-74 (11th Cir. 2011) (two non-examining physicians' opinions amounted to substantial evidence because the opinions were consistent with treating physician's records despite being

inconsistent with the treating physician's discredited opinion). The ALJ did not impermissibly discredit an examining source's opinions due to a non-examining source's contradicting opinion. The opinions of Drs. Wilson and Nichols and Ms. Phillips were given limited weight due to their inconsistency with their own treating records, not because Dr. Williams expressed a different opinion.

As explained previously, the court may not reweigh the evidence, even if the court determines that it would have weighed the evidence differently. *Miles*, 84 F.3d at 1400. Accordingly, substantial evidence supports the ALJ's decision to afford good weight to the opinion of Dr. Williams despite affording less weight to other examining sources' opinions.

## C. Subjective Complaints

Duckworth argues that the ALJ failed to provide adequate reasons for discrediting her subjective complaints. She asserts that "[t]he 'reasons' set out in the body of the decision by the ALJ are not adequate reasons for finding [her] not credible." (Doc. 17 at 33). The Commissioner contends that substantial evidence supports the ALJ's decision regarding Duckworth's subjective complaints.

The Eleventh Circuit established a standard to direct ALJs in evaluating claimant's subjective allegations of disabling pain and other symptoms. Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d

1553, 1561 (11th Cir. 1995). To establish disability based upon pain and other subjective symptoms, the "standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *see also Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

The ALJ is permitted to discredit the claimant's subjective testimony of pain and other symptoms if he articulates explicit and adequate reasons for doing so. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Under Social Security Ruling ("SSR") 16-3p,

> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10 (2017).[7]  Although the Eleventh Circuit

does not require explicit findings as to credibility, "'the implication must be

obvious to the reviewing court.'" *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d

at 1562).  "[P]articular phrases or formulations" do not have to be cited in an

ALJ's credibility determination, but it cannot be a "broad rejection which is "not

enough to enable [the district court or this Court] to conclude that [the ALJ]

considered her medical condition as a whole." *Id*.

In this case, to the extent that Duckworth now asserts she suffered from

chronic pain, it is unclear to the court where Duckworth ever complained during

the administrative proceedings that she suffered from chronic pain.   While

Duckworth did complain of acute pain in relation to potential cardiac events during

her visits to the emergency room (*see generally* tr. at 401-519, 606-68), she has

never complained to any of her physicians about disabling *chronic* pain.

Duckworth has not shown that the mild degenerative joint disease of her left elbow

caused debilitating pain.  Notably, to support that the proposition that her pain was

---

[7]      "SSR 16-3p eliminates the term 'credibility' from social security policy but does not
change the factors that an ALJ should consider when examining subjective pain testimony . . . .
SSR 16-3p provides clarification of the subjective pain standard; it does not substantively change
the standard." *Harris v. Berryhill*, No. 5:16-cv-01050-MHH, 2017 WL 4222611, at *3 n.2 (N.D.
Ala. Sept. 22, 2017); *see also Griffin v. Berryhill*, No. 4:15-cv-0974-JEO, 2017 WL 1164889, at
*6 n.10 (N.D. Ala. March 29, 2017) ("The Eleventh Circuit's pain standard is consistent with the
parameters that SSR 16-3p set forth.").  The 2017 version of SSR 16-3p supersedes the March
16, 2016, version only to address the applicable date of the ruling and its retroactivity.  2017 WL
5180304, at *13 n.27.  The versions are materially the same in all other respects. *Compare* 2017
WL 5180304, *with* SSR 16-3p, 2016 WL 1119029.

greater than credited, the plaintiff cites only to an exchange between the ALJ and herself regarding her education. (Doc. 17 at 32). The court fails to see how this testimony is relevant to the issue of pain.

More importantly, it does not appear to the court that the ALJ actually found the plaintiff not to be credible. The plaintiff fails to cite where the ALJ found her not to be credible, and a review of the ALJ's decision yields no possible citation. In fact, the ALJ stated:

> I find that the claimant's underlying medically determinable impairments, which are established by medically acceptable clinical and laboratory diagnostic techniques, can reasonably be expected to produce some symptoms. Therefore, upon consideration of all relevant evidence in the entire case record, including, but not limited to, the medical signs and laboratory findings, statements and other information provided by the claimant, by treating or examining physicians, or psychologist and other persons, I conclude that the intensity, frequency, duration, and functionally limiting effects of these symptoms, including pain, preclude the claimant from performing greater than light exertional tasks.

(Tr. at 35).[8] If anything, the ALJ accepted the plaintiff's testimony about her symptoms as credible and consequently weighed her testimony with the other evidence in the record.

Regarding the claimant's history of obesity, chronic obstructive pulmonary disease, and mild degenerative joint disease, the ALJ found as follows:

---

[8] Admittedly, the ALJ refers to pain here, but a review of the ALJ's decision yields no discussion of chronic pain or any pain for that matter.

In the present case the claimant's obesity is not such as to prevent ambulation, reaching, orthopaedic [sic] and postural maneuvers, or to prevent her from working or being able to complete a fairly full range of activities of daily living. It does reduce her ability to stand, walk, climb, stoop, kneel, crouch and crawl. Hence, a reduction to only light work with further appropriate work restrictions is therefore warranted. These limitations are accounted for in the residual functional capacity.

Additionally, the record demonstrates that the claimant has a history of chronic obstructive pulmonary disease, which reasonably establishes the need for various pulmonary environmental restrictions. Therefore, the residual functional capacity contains a provision that the claimant can no greater than occasionally be exposed to dusts, fumes, odors, gases and poor ventilation.

The claimant has mild degenerative joint disease in her left elbow (Exhibit D7F). I have considered the claimant's degenerative joint disease in her left elbow in finding that the claimant can lift/carry twenty pounds occasionally and ten pounds frequently.

(Tr. at 36).

If the plaintiff intended to rely upon the aforementioned testimony regarding her education (doc. 17 at 32) for the proposition that her mental and adaptive functioning were more severely limited than credited by the ALJ, then the plaintiff fails to establish that the ALJ's decision was not supported by substantial evidence. Ms. Phillips's records, the function reports, and Duckworth's work history contradict her subjective complaints and indicate that Duckworth was capable of maintaining attention and concentration for two hours, adapting to changes

introduced gradually and infrequently, and maintaining occasional contact with the public and co-workers. (*See* tr. at 34-36). Ms. Phillips's records regularly indicated that Duckworth's "appearance [wa]s appropriate"; that she was "oriented to person, place, time and situation"; that her behavior was unremarkable; that her affect was appropriate and her mood was euthymic; that her intellect was average; that she was cooperative; that her attention was "gained and maintained"; that her impulse control, judgment, and insight were fair; that her self-perception was realistic; that her thought processes were logical; and that her thought content was unremarkable. (Tr. at 530-31, 532-33, 538-39, 540-41, 557, 564-65, 567, 573-74, 576). Additionally, the function reports indicate that Duckworth is capable of helping others, such as her husband and stepdaughter; shopping; performing household chores; and managing finances. Finally, Duckworth has a history of semi-skilled labor involving public interaction on at least an occasional basis. To the extent that the plaintiff argues that the ALJ impermissibly relied upon her daily activities when assessing her subjective complaints, the plaintiff is wrong; the ALJ may consider the plaintiff's daily activities in assessing her subjective complaints. 20 C.F.R. § 404.1529(c)(3)(i).

As the Commissioner points out, the ALJ considered her subjective complaints in light of all of the record evidence, including medical records and information provided by the plaintiff. Accordingly, substantial evidence supports

the ALJ's decision to weigh Duckworth's credibility, as he did, with regard to her subjective complaints.

### D. RFC Assessment and Determination

Duckworth argues that the RFC is not supported by substantial evidence. First, she asserts that the ALJ impermissibly relied upon the VE's testimony, "which was not based on a correct or full statement of [Duckworth's] limitations or impairments." (Doc. 17 at 33). In other words, because the hypothetical question posed to the VE did not contain all of her limitations as alleged by Duckworth, the ALJ could not rely on the VE's testimony regarding the hypothetical question in establishing Duckworth's RFC. Second, she contends that the RFC violates SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996), because it is conclusory and fails to explain how the plaintiff can perform light work on a regular and continuing basis in light of the evidence in the record. The Commissioner argues that substantial evidence supports the ALJ's RFC, asserting that the ALJ properly rejected the stricter limitations posed to the VE in subsequent hypothetical questions and contending that the RFC sufficiently weighed and discussed the record evidence.

### 1. VE Testimony

The plaintiff's RFC is not a medical assessment; rather, it is "the most [the plaintiff] can do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1); *see*

*also Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).  In other words, a

"RFC is an assessment of an individual's ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing basis."

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  An ALJ "will assess . . . [a

claimant's RFC] based on all the relevant medical and other evidence in" the

record.  20 C.F.R. § 404.1520(e); *see also Phillips*, 357 F.3d at 1238.  Under SSR

96-8p,

> The RFC assessment must first identify the individual's functional
> limitations or restrictions and assess his or her work-related abilities
> on a function-by-function basis, including the functions in paragraphs
> (b), (c), and (d) of 20 CFR 404.1545 and 416.945.  Only after that
> may RFC be expressed in terms of the exertional levels of work,
> sedentary, light, medium, heavy, and very heavy.

1996 WL 374184, at *1.  Once established, the ALJ then uses the RFC to

determine whether the claimant can return to her previous work or adjust to new

work in the national economy.  *Phillips*, 357 F.3d at 1238.  Importantly, the

responsibility for assessing the RFC of a claimant is a matter reserved to the ALJ.

*See* 20 C.F.R. §§ 404.1527(e), 416.927(d).  However, the ALJ is required "to state

with particularity the weight he gives to different medical opinions and the reasons

why."  *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (citing

*Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).

In *Phillips*, the Eleventh Circuit explained the standard for relying upon a VE, as opposed to the Grid Guidelines, as follows:

> The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform." However, [e]xclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level *or* when a claimant has non-exertional impairments that significantly limit basic work skills."

*Phillips*, 357 F.3d at 1242 (emphasis in original) (quoting *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)). To be capable of completing a "full range of employment," the claimant must be "able to do 'unlimited' types of work at the given exertional level." *Phillips*, 357 F.3d at 1242. Once the ALJ determines that the claimant "cannot perform a full range or unlimited types of work at the [light work] level given her exertional limitations, then the ALJ must consult a vocational expert to determine whether there are sufficient jobs at the [light work] level within the national economy that [the claimant] can perform." *Phillips*, 357 F.3d at 1242. As the Eleventh Circuit has explained, "[i]n order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).

In this case, the ALJ relied on a VE to determine whether Duckworth could return to any of her past work or whether jobs existed in significant numbers within the national economy in light of the exertional and non-exertional limitations imposed by the ALJ. The ALJ presented the VE with multiple hypotheticals, containing various limitations. (*See* tr. at 82-83). The plaintiff asserts that the VE testified that she could not perform any work in light of the hypothetical posed to the VE which contained highly restrictive limitations. However, the plaintiff fails to account for the fact that the VE did determine that work existed in significant numbers in response to a hypothetical which contained less restrictive limitations. In fact, the hypothetical containing the less restrictive limitations mirrors the actual RFC in this case. (*Compare* tr. at 34 *with* tr. at 81-83). In the hypothetical, the ALJ asked the VE, as follows:

> Q. Assume that the Claimant has residual functional capacity to stand or walk six hours in an eight-hour day, sit six hours in an eight-hour day, lift or carry 20 pounds occasionally and 10 pounds frequently, can occasionally climb ramps and stairs, can never climb ladders, ropes or scaffolding, can occasionally stoop, kneel, crouch, crawl, can occasionally be exposed to dust, fumes, odors, gases and poor ventilation, can understand, remember and carry out simple instructions, can maintain attention and concentration for two-hour time periods in order to complete an eight-hour work day, can adapt to changes in the work force that are introduced gradually and infrequently, and can occasionally maintain interaction with the general public and co-workers. Would the Claimant be able to perform any of her past work either as she actually performed that work or as those occupations are generally performed in the national economy?

A No, no past work.

Q Assume that you have an individual that's the same age, educational background and past relevant work experience as the Claimant in this case, and that individual has a residual functional capacity that I just explained, would there be any unskilled occupations that an individual with the given profile and residual functional capacity could perform?

A Yes, Your Honor. Unskilled work at the light level of exertion, SVP of 1, would be inserter, 920.687-062, 215,000 in the national economy, 2,200 in the State of Alabama. SVP of 1, hand bander, 920.687-026, 600,000 in the national economy, 4,500 in Alabama. SVP of 2, bakery worker, 524.687-022, 43,000 nationally, 450 in the state.

(Tr. at 81-82). This hypothetical materially matches the RFC established by the ALJ. (Tr. at 34).

The ALJ may pose a hypothetical with more restrictive limitations to the VE, even if the ALJ determines that the more restrictive limitations are not supported by the record. *See Crawford*, 363 F.3d at 1161 ("the ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."). In other words, the ALJ is not bound by the hypothetical containing the most restrictive limitations if the record does not support those limitations, as the plaintiff appears to suggest. Here, the evidence in the record supports the restrictions imposed by the ALJ in the RFC, and those restrictions

were fully presented to the VE to determine the existence of a significant number of jobs in the national economy.

Additionally, the ALJ is not bound by the restrictions that the plaintiff's counsel posed to the VE. (*See* tr. at 83). As discussed previously, the responsibility for assessing the RFC of a claimant is a matter reserved to the ALJ, not the VE or the plaintiff's counsel. *See* 20 C.F.R. §§ 404.1527(e), 416.927(d).

Accordingly, the VE's testimony constitutes substantial evidence in support of the RFC assessed by the ALJ; the ALJ was not required to rely on the hypothetical containing the most restrictive limitations because the ALJ determined that the record did not support the most restrictive limitations.

2. RFC is not Conclusory

When establishing an RFC for the claimant, the ALJ must explain how the evidence supports the RFC. Specifically, SSR 96-8p requires, as follows:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[7], and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

. . .

> The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations.

. . .

> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

The ALJ extensively described the record evidence regarding Duckworth's physical and mental limitations, specifically addressing the records and opinions of Dr. Wilson, Dr. Nichols, Dr. Williams, Phillip Rogers, CRNP,[9] and Ms. Phillips, LCSW. Furthermore, the ALJ examined the function reports submitted by Duckworth and her husband. The court already has discussed elsewhere in this opinion the ALJ's weighing of the opinions and records regarding Duckworth's mental limitations; therefore, the court pretermits any further discussion of these records and opinions in this section. As to the plaintiff's physical limitations, the ALJ described Nurse Rogers's records as follows:

---

[9] It appears that Rogers focused on treating Duckworth's physical impairments.

However, I also observe that Philip Rogers, CRNP, a treating nurse practitioner, submitted a form in support of the claimant receiving food stamps on October 18, 2013. Nurse Practitioner Rogers indicated that the claimant was expected to return to work in six months (Exhibit D1F).

On September 2, 2014, Nurse Rogers related that the claimant's auscultation was normal, as was her respiratory effort (Exhibit D8F). Nurse Rogers indicated that all four of the claimant's extremities were normal. Moreover, Nurse Rogers related on December 22, 2014, that the claimant's physical examination was ostensibly normal (Exhibit D11F). The claimant's respiratory and musculoskeletal systems were normal. In fact, a review of the totality of the subsequent physical examinations reflects that the claimant's physical examinations have consistently been within normal limits, aside from her noted obesity (Exhibit D12F, D13F, and D14F).

(Tr. at 35-36). Notably, the ALJ states:

upon consideration of all relevant evidence in the entire case record, including, but not limited to, the medical signs and laboratory findings, statements and other information provided by the claimant, by treating or examining physicians, or psychologist[s] and other persons, I conclude that the intensity, frequency, duration, and functionally limiting effects of these symptoms, including pain, preclude the claimant from performing greater than light exertional tasks.

(Tr. at 35).

In the Eleventh Circuit, "even when the ALJ could have been 'more specific and explicit' in his findings with respect to a plaintiff's 'functional limitations and work-related abilities on a function-by-function basis,' they nonetheless meet the requirement under 96-8p if the ALJ considered all of the evidence." *Mill v. Colvin*,

No.2:12-cv-2869-LSC, 2013 WL 6407973, at *4 (N.D. Ala. Dec. 6, 2013). The court also understands that the ALJ is not required to refer to every piece of evidence in his determination, so long as his denial of the plaintiff's claim is not an arbitrary dismissal that does not consider the plaintiff's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal citations omitted). Clearly, the ALJ complied with SSR 96-8p in assessing Duckworth's RFC. She accurately addressed at length the medical records and opinions of Dr. Wilson, Dr. Nichols, Dr. Williams, Nurse Rogers, and Ms. Phillips. Accordingly, the RFC was not conclusory in violation of SSR 96-8p.

## IV. Conclusion

Upon review of the administrative record, and considering all of Duckworth's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered affirming the determination.

DONE this 7th day of August, 2018.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE